**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

PURVIN SHAH, DO,

        Plaintiff,

                                  Case No. 3:14-cv-1081-J-34JRK

vs.

ORANGE PARK MEDICAL CENTER, INC.
and INTENSIVE CARE CONSORTIUM, INC.,

        Defendants.

_____/

### O R D E R

      **THIS CAUSE** is before the Court on Defendant Orange Park Medical Center, Inc.'s Dispositive Motion to Dismiss Third Amended Complaint (Doc. 83; OPMC Motion), filed on November 24, 2015, and Defendants [sic] Intensive Care Consortium, Inc.'s Corrected Motion to Dismiss Plaintiff's Third Amended Complaint (Doc. 85; ICC Motion), filed on November 30, 2015.  Plaintiff Purvin Shah, DO (Shah) filed responses in opposition to the Motions on December 30, 2015.  See Plaintiff's Response in Opposition to Defendant Orange Park Medical Center's Dispositive Motion to Dismiss Third Amended Complaint (Doc. 90; Response to OPMC Motion); Plaintiff's Response in Opposition to Defendant Intensive Care Consortium, Inc.'s Dispositive Motion to Dismiss Third Amended Complaint (Doc. 91; Response to ICC Motion).  In addition, with leave of Court, Defendant Orange Park Medical Center, Inc. (OPMC) filed a reply in support of its Motion on February 1, 2016. See Defendant Orange Park Medical Center, Inc.'s Reply in Further Support of its Dispositive Motion to Dismiss (Doc. 95; OPMC Reply).  Accordingly, this matter is ripe for review.

I.      **Background**[1]

Shah, an Asian-Indian male, is a "licensed and board-certified Intensivist physician." See Plaintiff's Third Amended Complaint and Jury Demand (Doc. 75; Operative Complaint) ¶¶ 12, 45.  Defendant Intensive Care Consortium, Inc. (ICC) is a "for-profit corporation that contractually provides critical care medicine trained physicians called 'Intensivists' for 24-hour ICU coverage" at facilities such as OPMC, a "general medical and surgical hospital" in Orange Park, Florida.  See Operative Complaint ¶¶ 14-15, 26, Ex. B at 1.  In September of 2011, ICC and Shah entered into a Physician Employment Agreement (the ICC Agreement) by which ICC employed Shah to "provide medical services" at OPMC.  Id., Ex. B: ICC Agreement at 1.  Pursuant to the 2011 ICC Agreement, Shah worked as an "Intensivist physician" in the intensive care unit (ICU) and emergency room (ER) at OPMC until 2014.  See Operative Complaint ¶¶ 12-13, 71.  Shah alleges that he was "considered as joint employed by ICC and OPMC" in that both entities "exercised complete, joint control over every aspect of Dr. Shah's medical practice and . . . daily duties as an Intensivist at the OPMC Hospital . . . ."  Id. ¶¶ 23, 28.  Dr. Justin Gisel, a Caucasian male, was the OPMC's Director of ICU, Vice-Chairman of the Department of Medicine, Director of the Intensivist Program, and Director of Pulmonary Rehabilitation.  See id. ¶¶ 18-19.  Gisel also served on behalf of ICC as the Director of the Intensivist Program at OPMC, the Regional Director of Medical Operations and the Director of Physician Recruitment.  Id. ¶

---

[1] In considering the Motions to Dismiss, the Court must accept all factual allegations in Plaintiff's Third Amended Complaint and Jury Demand (Doc. 75; Operative Complaint) as true, consider the allegations in the light most favorable to the plaintiff, and accept all reasonable inferences that can be drawn from such allegations.  Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003); Jackson v. Okaloosa Cnty., Fla., 21 F.3d 1531, 1534 (11th Cir. 1994).  As such, the facts recited here are drawn from the Operative Complaint, and may well differ from those that ultimately can be proved.

20.   In addition, Dr. Leonardo Alonso, a Caucasian male, was a licensed physician at OPMC who served as the OPMC's Director of the ER, Chief of Medical Staff, and Chairman of the Medical Executive Committee, in addition to being a member of the OPMC's Board of Trustees.  Id. ¶¶ 21-22.

Shah alleges that in January of 2014, he "noticed an increase in OPMC's acts of gross medical malpractice, medical errors and untimely deaths of patients caused by certain incompetent physicians/nurses that worked" in the ER at OPMC.  Id. ¶ 29.  From January through April of 2014, Shah repeatedly complained about these errors to Gisel and Alonso, as well as Dr. Larry Coots, OPMC's Chief Medical Officer, Jennifer Mick, the ER Nursing Director, and Chad Patrick, the Chief Executive Officer of OPMC.  Id. ¶¶ 32, 43.  During this same time period, Shah also made reports to numerous individuals within OPMC about improper or unnecessary patient testing, the improper retention of nurses that Shah observed to be neglectful, and other concerns he had with "patient safety, medical malpractices and medical errors."  See id. ¶¶ 33-39.  In addition, Shah complained about "understaffing and dangerous scheduling of long work hours," which Shah "understood to be violations of ACHA standards."  Id. ¶ 40.[2]  Nonetheless, Shah states that "OPMC and ICC failed to take corrective actions and otherwise ignored [his] complaints and similar complaints of other concerned OPMC physicians and nurses."  Id. ¶ 41. Moreover, Shah alleges that Coots, Alonso, Gisel, and Mick instructed him and other staff not to record reportable medical errors and "to not 'throw the ER under the bus.'"  Id. ¶ 43. Shah asserts that he "suffered retaliation," after reporting these errors.  Id. ¶ 44.  Notably, Shah does not actually describe any incident that he perceived to be medical error,

---

[2] ACHA is not defined in the Operative Complaint.

malpractice, patient neglect, or other improper treatment of a patient.  Indeed, the only factual information provided is that one such alleged incident occurred on March 26, 2014.  See id. ¶ 43.

In addition to his concerns with patient care, Shah alleges that in January of 2014, he also reported to Patrick that Shah "was being treated unequally with respect to the benefits, terms and conditions of his employment, specifically his salary/pay, work scheduling, entitlements, benefits and Dr. Gisel's and OPMC's refusal to allow him to participate in hospital committee and leadership positions, despite the opportunities being provided to non-Asian-Indian employees." Id. ¶ 48.  According to Shah, Patrick and Gisel ignored his concerns and prevented him from participating "in any leadership capacity on OPMC's hospital committees and departments during his tenure of employment at OPMC." Id. ¶ 49.  Shah also complained to Coots that he was "being treated unequally" and "subject[ed] to disparate treatment based on his race and/or national origin." Id. ¶ 50. Specifically, he reported that "ICC failed to pay [Shah] for his Florida medical license, DEA certificate and Continuing Medical Education (CME) courses as ICC did for all of its Caucasian physicians." Id.  These complaints were ignored. Id. ¶ 51.

Shah's contentious relationship with OPMC and ICC reached its tipping point on March 31, 2014, when Shah made a report to Alonso and Mick about some unidentified "patient neglect and medical errors that had occurred regarding a patient on March 26, 2014." See id. ¶ 53.  Shah alleges that after he "complained about the manner in which this subject patient was neglected and mistreated, Dr. Alonso, Nurse Mick and OPMC filed a retaliatory complaint" against him. Id. ¶ 54.  On April 1, 2014, OPMC notified Shah that Alonso had "filed an official complaint against him alleging that he was a 'disruptive

physician.'" Id. ¶ 55.  Shah was then subjected to a disciplinary hearing on April 10, 2014, before the OPMC's Medical Executive Committee (MEC).  Id. ¶ 56.  According to Shah, prior to the hearing Alonso told him that "he had already spoken to all the members of the MEC and that the MEC committee 'had already made up their minds.'"  Id. ¶ 57.  Alonso also selected the members of the MEC panel, led and facilitated the hearing, and invited Gisel, who was not a member of the MEC, to participate in the hearing.  Id. ¶¶ 59-60, 62. Despite his request to do so, Shah was not allowed to have an attorney, or witnesses present at the hearing.  Id. ¶ 61.  Patrick also participated in the MEC hearing.  Id. ¶ 63.  At the hearing, Gisel told MEC members that Shah was a "disruptive physician" with a "history of disruptive behavior as a physician," and "harshly criticized" Shah's medical skills and work performance.  Id. ¶¶ 64-65.  In turn, Shah "reissued his complaints about patient safety concerns, and racial/national origin discrimination."  Id. ¶ 66.

Shah maintains that following the "discriminatory treatment" and "retaliation for his complaints about patient safety," and because OPMC and ICC took "no action," on April 12, 2014, he was "forced to give his contractually required ninety (90) day constructive discharge notice effective July 12, 2014, informing OPMC and ICC that he could no longer endure and tolerate ICC's and OPMC's intolerable work environment, the race based discrimination and retaliation."  Id. ¶ 67.  On that date, Shah also informed P. William Ludwig, M.D., the Chief Executive Officer of ICC, about the "sham, biased MEC hearing," and Gisel's "defamatory statements."  Id. ¶ 68.  In the days and weeks that followed, Shah made additional reports to other corporate officials regarding the purported patient care issues, sham MEC hearing, and racial discrimination.  Id. ¶¶ 69-70.  On July 12, 2014, the end of Shah's ninety-day notice period, Patrick informed Shah that his OPMC physician

staff privileges were terminated and he would not be allowed to participate in a "peer review appeal/hearing to challenge the termination of his physician staff privileges." Id. ¶¶ 71-72. Shah maintains that prior to his employment with ICC, he had "independently maintained physician staff privileges to work at OPMC," and his "staff privileges were not contingent on his position with ICC." Id. ¶ 71; see also id. ¶ 17. However, the ICC Agreement provides that: "medical staff appointment and/or clinical privileges may be terminated or not renewed by [OPMC] or its medical staff, in their discretion, without recourse to the hearing and appeal procedures set forth in the medical staff and/or [OPMC] bylaws upon: (a) the termination of this Agreement . . . ." See ICC Agreement at 3.

Thereafter, on September 8, 2014, Shah initiated this action against OPMC and ICC, among others. See Plaintiff's Complaint and Jury Demand (Doc. 1; Original Complaint).[3] Shah is now on his third lawyer since filing this case and his fourth attempt to plead his claims. See Complaints (Docs. 1, 33, 68, 75); Attorneys (Docs. 52, 78, 81). In the Operative Complaint, Shah raises claims of race discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, et seq. ("Title VII"), and Title 42, United States Code, Section 1981 ("Section 1981"). See Operative Complaint, Cts. I-II, IV-V, VII-X.[4] In addition, Shah asserts state law claims for retaliation in violation of the Florida Whistleblower Protection Act, Florida Statutes section 448.102(3).

---

[3] The Original Complaint named several additional defendants who were later dismissed pursuant to a stipulation of dismissal. See Order (Doc. 28), entered November 26, 2014.

[4] The Court notes that the Counts labeled IX and X actually precede the Counts labeled VII and VIII in the Operative Complaint. See Operative Complaint at 23-27. Nonetheless, to avoid confusion, the Court will refer to these Counts by the Roman numeral with which they are labeled, as opposed to their correct numerical order. In addition, the page numbering on the bottom of the Operative Complaint labels every page as "Page 4 of 30." See generally Complaint. As such, the Court will cite to the pages of the Operative Complaint using the ECF numbering appearing at the top right corner of the document.

Id., Cts. III, VI.  OPMC and ICC move to dismiss all of Shah's claims for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure (Rule(s)).

## II.    Standard of Review

In ruling on a motion to dismiss, brought pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002).  In addition, all reasonable inferences should be drawn in favor of the plaintiff.  See Omar ex. rel. Cannon v. Lindsey, 334 F.3d 1246, 1247 (11th Cir. 2003) (per curiam).  Nonetheless, the plaintiff must still meet some minimal pleading requirements.  Jackson v. Bellsouth Telecomm., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted).  Indeed, while "[s]pecific facts are not necessary[,]" the complaint should "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Further, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal quotations omitted); see also

Jackson, 372 F.3d at 1262 (explaining that "[c]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted).  Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," which simply "are not entitled to [an] assumption of truth."  See Iqbal, 556 U.S. at 678, 680-81.  Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. at 678 (quoting Twombly, 550 U.S. at 570).

## III.    Federal Claims

Title VII provides "that it is unlawful for an employer 'to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'"  Holifield v. Reno, 115 F.3d 1555, 1561 (11th Cir. 1997) (quoting 42 U.S.C. §§ 2000e-2(a)(1)).  "Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts."  Ferrill v. Parker Grp., Inc., 168 F.3d 468, 472 (11th Cir. 1999).[5]  Although Shah brings his race discrimination and retaliation

---

[5] Section 1981 provides:

    (a) **Statement of equal rights**
**All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and no other.**

**(b) "Make and enforce contracts' defined**
**For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.**

**(c) Protection against impairment**

8

claims under both Title VII and Section 1981, the analysis of a race discrimination or retaliation claim under these laws is identical.  See Standard v. A.B.E.L. Servs., 161 F.3d 1318, 1330 (11th Cir.1998) (stating that Title VII and Section 1981 have the same requirements of proof and use the same analytical framework); see also Anyanwu v. Brumos Motor Cars, Inc., 496 F. App'x 943, 948 (11th Cir. 2012).  Accordingly, the Court will discuss Shah's Title VII and Section 1981 claims together.  See Stallworth v. Shuler, 777 F.2d 1431, 1433 (11th Cir. 1985) (a racial discrimination claim under Title VII need not be discussed separately from a Section 1981 discrimination claim).[6]

### A.  Race Discrimination

To establish a prima facie case of discrimination by disparate treatment, "the plaintiff must show that (1) [he] is a member of a protected class; (2) [he] was subjected to an adverse employment action; (3) [his] employer treated similarly situated employees outside [his] protected class more favorably than [he] was treated; and (4) [he] was qualified for the job."  See Burke-Fowler v.Orange Cnty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006); see also Olson v. Dex Imaging, Inc., No. 8:14-cv-1829-T-30TGW, 2014 WL 5420811, at *6 (M.D. Fla. Oct. 22, 2014).  However, a plaintiff need not allege facts sufficient to make out

---

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981 (2006).

[6] In the Operative Complaint, Shah alleges that he was jointly employed by OPMC and ICC.  See Operative Complaint ¶¶ 9, 23, 28.  OPMC argues that it was not Shah's employer and that to the extent the Operative Complaint alleges otherwise, those allegations are contradicted and superseded by the terms of the ICC Agreement and OPMC Bylaws of the Medical Staff (OPMC Bylaws) which are attached as exhibits to the Operative Complaint.  See OPMC Motion at 5-6, 20-22; see also Operative Complaint, Exs. A-B.  However, the Court need not resolve this issue because even if the Court treats OPMC as Shah's joint employer, the claims against OPMC are due to be dismissed for the reasons set forth below.  Accordingly, in the analysis that follows the Court will assume, without deciding, that Shah's allegations are sufficient to establish that OPMC and ICC were his joint employers.

a prima facie case in order to survive a motion to dismiss.  Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 974 (11th Cir. 2008) (citing Swierkiewicz, 534 U.S. at 511); see also Surtain v. Hamlin Terrace Found., 789 F.3d 1239, 1246 (11th Cir. 2015); Uppal v. Hosp. Corp. of Am., 482 F. App'x 394, 396 (11th Cir. 2012) ("[A] plaintiff need not satisfy the McDonnell Douglas[7] framework at the pleading stage in order to state a claim for disparate treatment . . . .").  Nonetheless, "complaints alleging discrimination still must meet the 'plausibility standard' of Twombly and Iqbal."  See Henderson v. JP Morgan Chase Bank, 436 F. App'x 935, 937 (11th Cir. 2011).  This standard requires well-pled factual allegations that are more than "'merely consistent with a defendant's liability,'" and raise "'more than a sheer possibility that a defendant has acted unlawfully.'"  See Bowers v. Bd. of Regents of Univ. Sys. Of Ga., 509 F. App'x 906, 910 (11th Cir. 2013) (quoting Iqbal, 556 U.S. at 678).  Indeed, the facts alleged must be sufficient to support a reasonable inference that the defendant engaged in racial discrimination against the plaintiff.  See Henderson, 436 F. App'x at 937.  One way to meet this standard is by "alleging facts showing that similarly-situated [individuals] outside [the plaintiff's] racial class were" treated more favorably.  Id.

    1.    **OPMC**

In the Response to OPMC Motion, Shah maintains OPMC racially discriminated against him in the following ways: (1) he was prevented from participating in any leadership position at OPMC, (2) he was "subjected to a sham credentialing hearing," (3) he was constructively discharged from employment, and (4) his clinical privileges were revoked.

---

[7] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

<u>See</u> Response to OPMC Motion at 10-11 (citing Operative Complaint ¶¶ 49, 59-66, 67, 71).  In support of the first purportedly discriminatory action, Shah alleges that: (1) Gisel and OPMC refused "to allow him to participate in hospital committee and leadership positions, despite these opportunities being provided to non-Asian-Indian employees," and (2) Patrick and Gisel "prevented [Shah's] participation in any leadership capacity on OPMC's hospital committees and departments . . . ."  <u>See</u> Operative Complaint ¶¶ 48-49. Shah attaches to the Operative Complaint the OPMC Bylaws of the Medical Staff (Doc. 75-1; OPMC Bylaws) which set forth the numerous committee and leadership positions at OPMC and the various methods by which members of the medical staff are either appointed, or nominated and elected, to those positions.  <u>See</u> Operative Complaint, Ex. A: OPMC Bylaws, arts. 7-8. The Operative Complaint does not state whether Shah ever pursued one of those positions, but even assuming he did, Shah does not allege which position(s) he sought, the circumstances in which he was denied the position(s), or how Gisel and Patrick purportedly prevented him from obtaining the position(s).  For example, the OPMC Bylaws provide that it is the duty of a department chairperson to appoint department members to positions on departmental committees, <u>see</u> OPMC Bylaws § 8.6.9.2, but neither Gisel nor Patrick are alleged to be the chairperson of Shah's department. <u>See</u> Operative Complaint ¶¶ 19, 32 (identifying Gisel as vice-chairman of the department of medicine and Patrick as CEO of OPMC).  Likewise, it is the MEC that appoints medical staff members to standing committee positions, OPMC Bylaws § 9.4.3, but Gisel is not on the MEC, <u>see</u> Operative Complaint ¶ 62, and Patrick is only a non-voting ex-officio member, <u>see</u> OPMC Bylaws § 9.5.1.  Shah does not allege that Gisel holds a seat on the nominating committee either, of which Patrick is also merely an ex-officio, non-

voting member.  See id. § 9.12.1.  Thus, it is entirely unclear what role, if any, Gisel or Patrick have in the selection of committee seats or leadership positions.  Because the Operative Complaint does not identify the position(s) that Shah was wrongfully denied, or the actions Gisel or Patrick took to prevent his selection, it is impossible to ascertain from the Operative Complaint the factual basis for Shah's contention that racial discrimination motivated these actions.  Moreover, although Shah maintains that he is "well-qualified" and a "well-regarded physician," see Operative Complaint ¶¶ 16, 47, he does not allege that he met the qualifications necessary to hold these positions, nor does he provide any non-conclusory allegations demonstrating that he was qualified for the committee or leadership roles he sought.  See Pouyeh v. Bascom Palmer Eye Inst., 613 F. App'x 802, 811 (11th Cir. 2015) (affirming dismissal of employment discrimination claim because plaintiff "failed to provide sufficient factual matter to show he was qualified for the position," where plaintiff alleged that he was qualified but did not allege the specific qualifications necessary or that he fulfilled them).

Shah attempts to tie his lack of a leadership position to race discrimination by alleging, in a conclusory manner, that these "opportunities" were provided to non-Asian-Indian employees.  See Operative Complaint ¶ 48.  However, without any factual allegations showing that Gisel or Patrick treated similarly situated employees more favorably, or that a similarly situated physician obtained a specific position that was denied to Shah, this conclusory allegation alone is insufficient to raise an inference of discrimination.  See Uppal, 482 F. App'x at 396 (affirming dismissal of a race discrimination case where plaintiff "never once supplements these allegations of disparate treatment with any factual detail, such as even a brief description of how the alleged comparator

employees were outside of her protected class"); Veale v. Fla. Dep't of Health, No. 2:13-cv-77-FtM-38UAM, 2013 WL 5703577, at *5 (M.D. Fla. July 29, 2013) ("[Plaintiff] has simply stated that there were other employees that were similarly situated, outside her protected class, who received more favorable treatment.  Such a recitation, without any allegations of specific facts to explain how the disparate treatment occurred to even give rise to an inference of discrimination, is insufficient." (citation omitted)).  Shah attempts to address this problem by arguing that he is not required to point to specific comparators at this stage in the proceedings.  See Response to OPMC Motion at 14.  Shah contends that he "must be allowed some discovery to determine the relative experience and qualifications of potential comparators," and that, absent any information on comparators, "it is sufficient to allege there is a significant disparity between the number of committee and leadership roles filled by Asian Indians versus non-Asian Indians."  See Response to OPMC Motion at 14-15.  While the Court agrees that reference to similarly situated comparators is not the only means by which a plaintiff can state a claim for race discrimination, the problem for Shah is that he does not otherwise set forth any well-pled facts from which one could plausibly infer that race discrimination occurred.  See Caraway v. Sec'y, U.S. Dep't of Transp., 550 F. App'x 704, 710 (11th Cir. 2013) ("Given that the amended complaint did not specifically allege the existence of a valid comparator or otherwise allege facts giving rise to an inference of disparate treatment, the plaintiffs failed to allege a valid [discrimination] claim.").  Indeed, even if Shah could state a claim for disparate treatment based on allegations of a statistical disparity in committee positions, the Operative Complaint does not actually contain any factual allegations describing such a disparity.  Cf. Hussey v. N.Y. State Dep't of Law/Office of Att'y Gen., 933 F. Supp. 2d 399, 408-09

(E.D.N.Y. 2013) (finding that statistical allegations, standing alone, are insufficient to "push [plaintiff's] claim from conceivable to plausible," and that the statistics provided were "unsupported and overbroad" and did not give rise to an inference of discrimination).

Nonetheless, Shah contends that the Court should not require him to allege additional information because "OPMC is in possession of all information regarding the qualifications, deliberation, and selection criteria of medical staff committee members." See Response to OPMC Motion at 15.  The Court "cannot accept this argument, however, because it would absolve [Shah] of the responsibility under Twombly to plead facts 'plausibly suggesting'" race discrimination.  See Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1338 (11th Cir. 2010).  As stated above, Shah does not include even a modicum of factual information with respect to his purportedly thwarted attempts to obtain leadership positions at OPMC, the allegedly similarly situated individuals who obtained these positions instead of him, or the racial diversity of the staff and committees, information which, at least to some degree, Shah would have had available to him.  The Supreme Court has cautioned that to obtain discovery, a plaintiff must present more than his own conclusion that the action taken against him was due to his race.  See Iqbal, 556 U.S. at 678 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").  The unadorned allegation that Shah was prevented from obtaining a leadership or committee position when employees outside of his racial group were not "epitomizes speculation and therefore does not amount to a short and plain statement of [his] claim under Rule 8(a)."  See Davis, 516 F.3d at 974 (finding that claims supported only by the allegation that plaintiffs were denied promotions and treated differently than similarly situated white employees solely because of race were insufficiently pled); see also

Hussey, 933 F. Supp. 2d at 409 ("'Plaintiff has done little more than allege that [she] is African-American and that [she was] not [promoted],' which is insufficient to meet the threshold plausibility standard." (citation omitted) (alterations in original)).

Next, Shah asserts that he was denied "an unbiased and fair Peer Review Hearing process" due to his race. See Operative Complaint ¶¶ 77(d), 141.  Upon review of the allegations concerning the MEC hearing, the Court finds that Shah still fails to adequately allege a claim for race discrimination.  As explained above, to state a race discrimination claim, Shah must allege facts demonstrating that he was subjected to an adverse employment action.  See McCone v. Pitney Bowes, Inc., 582 F. App'x 798, 800-01 (11th Cir. 2014).  However, "not all conduct by an employer negatively affecting an employee constitutes adverse employment action."  See Davis v. Town of Lake Park, Fla. (Davis v. Lake Park), 245 F.3d 1232, 1238 (11th Cir. 2001).  Rather, "an employee must show a serious and material change in the terms, conditions, or privileges of employment."  Id. at 1239; see also Crawford v. Carroll, 529 F.3d 961, 974 n.14 (11th Cir. 2008) (noting that the broader standard applicable in retaliation claims has no application to substantive Title VII discrimination claims).  While a plaintiff is not required to prove "direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." Davis v. Lake Park, 245 F.3d at 1239.  "Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances."  Id.; see also Holland v. Gee, 677 F.3d 1047, 1057 (11th Cir. 2012); Miller-Goodwin v. City of Panama City Beach, Fla., 385 F. App'x 966, 970 (11th Cir. 2010).  "Otherwise . . . every trivial personnel action that an

irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." <u>Doe v. DeKalb Cnty. Sch. Dist.</u>, 145 F.3d 1441, 1449 (11th Cir. 1998) (internal quotations omitted).

Here, the Operative Complaint does not describe any tangible harm to Shah from merely having to attend the hearing, nor any action taken against Shah as a result of the hearing.[8]   As such, the hearing itself, absent any tangible adverse consequences, is insufficient to constitute an adverse employment action.  <u>See</u> <u>Rademakers v. Scott</u>, 350 F. App'x 408, 412-13 (11th Cir. 2009) <u>affirming</u> No. 2:07-cv-718, 2009 WL 3459196, at *2, *4 (M.D. Fla. Jan. 22, 2009) ("An investigation into alleged misconduct is not such adverse employment action and cannot support [plaintiff's] retaliation claim."); <u>Rogers v. Ga. Dep't of Corr.</u>, No. 5:10-CV-499 (MTT), 2012 WL 5398804, at *7, *11 (M.D. Ga. Nov. 2, 2012) ("[T]he Eleventh Circuit has held that initiation of an internal investigation against an employee does not constitute an adverse employment action.").  While Shah was subjected to criticism at the hearing by his superiors, he does not allege that this criticism had any tangible consequence on his employment and therefore the critiques of his work are insufficient.  <u>See</u> <u>Davis v. Lake Park</u>, 245 F.3d at 1241-42 ("[C]riticisms of an employee's job performance—written or oral—that do not lead to tangible job consequences will rarely form a permissible predicate for a Title VII suit."); <u>Hooks v. Bank of Am.</u>, 183 F. App'x 833,

---

[8] Shah attaches a letter dated May 28, 2014, to his Response to OPMC Motion outlining the recommendations of the MEC as a result of its investigation into Shah's behavior.  <u>See</u> Response to OPMC Motion, Ex. A.  However, this letter and the recommendations contained therein are neither referenced in, nor attached to, the Operative Complaint.  Rather, according to the Operative Complaint, the hearing occurred on April 10, 2014, and Shah gave notice of his resignation on April 12, 2014.  <u>See</u> Operative Complaint ¶¶ 56, 67.  A party cannot "use his briefing to add new allegations and argue that those new assertions support his cause of action."  <u>See</u> <u>Michel v. NYP Holdings, Inc.</u>, 816 F.3d 686, 705-06 (11th Cir. 2016).  Shah makes no attempt to assert any legal basis for the Court to consider these new allegations, and given the numerous opportunities Shah has had to amend his pleadings and include all relevant facts, the Court will not allow Shah to supplement his pleadings in this manner.

836 (11th Cir. 2006) (finding oral and written reprimands, without material change in terms or conditions of employment, are not adverse employment actions).

Moreover, Shah does not allege any facts raising the inference that his treatment at the hearing, even if unfair, was racially motivated. Indeed, Shah's allegations actually indicate that Alonso's motivation for the complaint and hearing was Shah's conduct in reporting an incident of patient neglect. See Operative Complaint ¶¶ 53-56. Shah does not allege that Alonso declined to complain about non-Asian-Indian physicians who engaged in similar conduct, nor does Shah suggest that he was subjected to a hearing when in similar circumstances physicians outside his racial group were not. In addition, while Shah draws the conclusion that the hearing was biased and unfair, he does not allege that the procedures implemented at his hearing differed from those used with other, non-Asian-Indian physicians or even from the procedures required in the OPMC Bylaws. Absent any facts indicating disparate treatment based on race, and in light of allegations indicating an obvious, non-racially motivated basis for the complaint and hearing, Shah fails to state a plausible claim for race discrimination premised on the "sham" peer review hearing. Iqbal, 556 U.S. at 682 ("As between that 'obvious alternative explanation' for the [subject conduct], and the purposeful, invidious discrimination [plaintiff] asks us to infer, discrimination is not a plausible conclusion.").

Shah also alleges that he was constructively discharged as a result of OPMC's racial discrimination. "A constructive discharge occurs when a discriminatory employer imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'" See Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974, 977 (11th Cir. 2003) (alteration in original) (quoting Poole v. Country Club of

Columbus, Inc., 129 F.3d 551, 553 (11th Cir. 1997)); Bryant v. Jones, 575 F.3d 1281, 1298 (11th Cir. 2009) ("Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." (citation omitted)).  Notably, "[t]he standard for proving constructive discharge is higher than the standard for proving a hostile work environment and the plaintiff must do more than merely show that she was subjected to actionable harassment."  See Mars v. Urban Trust Bank, No. 2:14-cv-54-FtM-29CM, 2014 WL 2155243, at *2 (M.D. Fla. May 22, 2014).  A plaintiff demonstrates a hostile work environment by alleging "harassing behavior 'sufficiently severe or pervasive to alter the conditions of [his] employment,'" and thus, to establish a constructive discharge, a plaintiff must demonstrate "a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment."  Id. (citation omitted).  Significantly, "only conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis."  See Jones v. UPS Ground Freight, 683 F.3d 1283, 1297 (11th Cir. 2012) (citation omitted).

Upon review, the Operative Complaint contains virtually no allegations of harassment, much less severe or pervasive harassment tied to Shah's race.  Shah offers only conclusory allegations that he was subjected to "discriminatory treatment and retaliation," and that he "could no longer endure and tolerate ICC's and OPMC's intolerable work environment, the race based discrimination, and retaliation."  See Operative Complaint ¶ 67.  Shah alleges that Alonso and Gisel unfairly complained that Shah was a "disruptive physician," criticized his medical skills, and subjected Shah to a "biased" disciplinary hearing, but these allegations fall far short of the type of severe or pervasive harassment required to establish constructive discharge.  See Perry v. Rogers, 627 F.

App'x 823, 838-42 (11th Cir. 2015); <u>Nettles v. LSG Sky Chefs</u>, 211 F. App'x 837, 839 (11th Cir. 2006); <u>see also</u> <u>Pipkins v. City of Temple Terrace, Fla.</u>, 267 F.3d 1197, 1201 (11th Cir. 2001) ("Repeatedly receiving poor evaluations would be unpleasant for anyone, but it does not rise to the level of such intolerable conditions that no reasonable person would remain on the job."). Shah has neither alleged "serious and material changes in the terms, conditions, or privileges of [his] employment," nor has he described any discriminatory conduct that was "frequent, severe, physically threatening or humiliating, or interfering with [his] work performance."[9] <u>See Mars</u>, 2014 WL 2155243, at *3; <u>see also</u> <u>Palmer v. McDonald</u>, 624 F. App'x 699, 703-04 (11th Cir. 2015). Moreover, as discussed above, Shah does not provide any facts from which one could infer that the aforementioned conduct was racially motivated. To the contrary, Shah's allegations indicate that the "disruptive physician" complaint and subsequent hearing were motivated by Shah's actions in reporting the perceived mistreatment of a patient, and therefore, these allegations do not support a race-based constructive discharge claim. <u>See Jones</u>, 683 F.3d at 1297. Accordingly, the Court finds that Shah fails to state a claim for race discrimination based on constructive discharge.

Shah's last theory of race discrimination against OPMC is that the revocation of his staff privileges was racially motivated. Once again, however, the allegations do not

---

[9] As discussed elsewhere in this Order, to the extent Shah contends that he was forced to resign because he was unable to obtain a leadership or committee position, and was subjected to purported disparities in pay, work scheduling, and job benefits, these allegations are entirely conclusory and devoid of facts plausibly demonstrating any connection to his race. Thus, these allegations do not support his claim of constructive discharge based on race discrimination. <u>See Perry</u>, 627 F. App'x at 836-37 ("Because [plaintiff] has not demonstrated that any of these instances [of disparate treatment] were racially motivated . . . she cannot rely on them in support of her hostile-work-environment claim."). For the same reason, to the extent Shah contends that he was forced to resign because OPMC and ICC took no action on his complaints about patient safety, <u>see</u> Operative Complaint ¶ 67, the purported mistreatment of patients is not conduct "based on" race, and thus, not relevant to Shah's race discrimination claim. <u>See Jones</u>, 683 F.3d at 1297.

plausibly suggest that Shah's race was the basis for this decision.  Shah alleges that on April 12, 2014, he gave his "contractually required ninety (90) day constructive discharge notice effective July 12, 2014, informing OPMC and ICC that he could no longer endure and tolerate ICC's and OPMC's intolerable work environment, the race based discrimination, and retaliation."  See Operative Complaint ¶ 67.  Accordingly, ninety days later, on July 12, 2014, OPMC terminated Shah's physician staff privileges.  Id. ¶ 71.  On these facts, there is simply no plausible basis to infer that Shah's race played any part in OPMC's decision to terminate Shah's staff privileges. Rather, the only plausible inference is that the revocation was the natural consequence of Shah's resignation.  Although Shah maintains that he had staff privileges at OPMC prior to his employment with ICC, he does not identify any non-Asian-Indian physician who tendered his or her resignation to ICC and OPMC, but nonetheless retained staff privileges.   The ICC Agreement specifically contemplates that OPMC may terminate a physician's privileges without a hearing or appeal procedures if the ICC Agreement is terminated.  See ICC Agreement at 3.  Thus, Shah's contention that this revocation was racially-motivated is simply not plausible.  In light of the foregoing, the Court will dismiss Shah's race discrimination claims against OPMC because they are wholly conclusory and devoid of any facts from which to plausibly infer disparate treatment on the basis of race.

## 2.    ICC

Shah also brings race discrimination claims against ICC.  Shah argues that ICC took the following racially-motivated adverse employment actions against him: "(1) he was denied equal pay in salary and bonuses in comparison to other similarly situated ICC physicians; (2) he was subjected to harsher disciplinary standards; and (3) he was denied

equal terms, privileges, and conditions of his employment with ICC." <u>See</u> Response to ICC

Motion at 8.  Turning to the first purported adverse employment action, the sole allegations

in support of Shah's claim that he was denied equal pay, benefits and employment

conditions are as follows:

> "In January 2014, Dr. Shah met with Mr. Patrick, CEO, and reported that he was
> being treated unequally with respect to the benefits, terms and conditions of his
> employment, specifically his salary/pay, work scheduling, entitlements, [and]
> benefits . . . ."  See Operative Complaint ¶ 48.

> "Dr. Shah complained to Dr. Larry Coots, OPMC's Chief Medical Officer, that he
> was being treated unequally in the privileges of his employment, and that he was
> subject to disparate treatment based on his race and/or national origin[.]
> Specifically, Dr. Shah complained that ICC failed to pay him for his Florida medical
> license, DEA certificate and Continuing Medical Education (CME) courses as ICC
> did for all of its Caucasian physicians."  Id. ¶ 50.

Notably, these allegations do not directly allege that Shah was not receiving equal

treatment, only that Shah complained that he was not receiving equal treatment.

Regardless, these statements are wholly conclusory and do little more than paraphrase the

relevant statute.  Shah does not provide any information to support his conclusion that his

"salary/pay, work scheduling, entitlements, [and] benefits" were unequal to others, and that

this disparity was based on race.  Because Shah does not identify any comparators, it is

unclear who he believes received more favorable terms of employment, how ICC treated

that person more favorably, or whether that person was similarly situated to Shah.  <u>See</u>

<u>Benjamin v. Holy Cross Hosp.</u>, No. 11-62142-CIV, 2012 WL 1900026, at *2 (S.D. Fla. May

24, 2012) (dismissing race discrimination claim premised on unequal pay where there was

"insufficient information alleged to determine whether the employees identified as receiving

higher pay qualify as similarly situated comparators").  Thus, it is impossible to tell the facts,

if any, that support Shah's contention that his compensation, schedule, and benefits were

unequal to others, much less the basis for his conclusion that these differences were based on race. While Shah is not required to include detailed allegations, absent any non-conclusory facts to support Shah's belief that he was treated unequally due to his race, the Court finds that these allegations are insufficient to state a claim for relief. See Twombly, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (alteration in original) (citation omitted)); Arafat v. Sch. Bd. of Broward Cnty., 549 F. App'x 872, 874 (11th Cir. 2013).

Although Shah provides slightly more detail as to ICC's purportedly discriminatory refusal to pay certain benefits, the Court is nonetheless convinced that this sweeping allegation does not give rise to a plausible claim for discrimination either. Shah contends that ICC failed to pay for his Florida medical license, DEA certification and CME courses, as it did for all Caucasian physicians. See Operative Complaint ¶ 50. However, the ICC Agreement attached to the Operative Complaint specifically provides that ICC will "reimburse [Shah] for, or pay, the renewal fees for Physician's DEA License and Florida Medical License" as well as a "CME stipend" of $500 per year. See ICC Agreement at 12. Shah does not provide any factual allegations regarding the circumstances in which ICC purportedly refused to honor its contractual obligations—had Shah asked for reimbursement and been denied?[10] Moreover, Shah does not provide any information about the similarly situated Caucasian physicians who purportedly received these benefits when Shah did not. Shah's generic reference to "all of [ICC's] Caucasian physicians," is

___

[10] Confusingly, Shah alleges that he reported ICC's failure to properly pay these benefits to Coots, the Chief Medical Officer at OPMC, see Operative Complaint ¶ 50, but does not include this failure in his list of complaints to Ludwig, the Chief Executive Officer of ICC, id. ¶ 68.

simply not the type of well-pled factual allegation required by Iqbal and Twombly.  See Arafat, 549 F. App'x at 874 ("[Plaintiff] generically referenced younger males, but nowhere in her complaint does she identify any valid comparators to undergird her disparate treatment claims.  Her allegations, therefore, do not plausibly suggest intentional discrimination, and her disparate treatment claims fail as a result."); Steinberg v. Donahoe, No. 13-61617, 2014 WL 1356711, at *11 (S.D. Fla. Apr. 7, 2014) (finding insufficient the conclusory statement that plaintiff was denied benefits "'while other non-Jewish employees were not so denied'").[11]

Shah also alleges that ICC discriminated against him by subjecting him to "harsher disciplinary standards" than similarly situated Caucasian comparators.  See Operative Complaint ¶ 103.  However, the Operative Complaint is devoid of any factual allegations to support Shah's conclusion that ICC subjected him to any discipline, much less discipline that was more severe than that imposed on other non-Asian-Indian doctors who engaged in the same conduct.  Although unclear, Shah's reference to the disciplinary standards presumably refers to Alonso's "disruptive physician" complaint against Shah and the resulting disciplinary hearing before the MEC at OPMC.  But, the actions of Alonso and the MEC do not appear to involve ICC.  To the extent Shah's reference to "disciplinary standards" is premised on Gisel's comments at the MEC hearing, such criticism, with no tangible effect on Shah's employment, is not an actionable adverse employment action.  Davis v. Lake Park, 245 F.3d at 1241-42.  Regardless, as discussed above, Shah does not

---

[11] Once again Shah attempts to excuse this failure by arguing that he must be allowed some discovery before he can provide any information as to the Caucasian physicians who received greater compensation and additional employment benefits.  See Response to ICC Motion at 7-8.  For the reasons stated above, the Court rejects Shah's contention that he should obtain discovery without satisfying the requirements of Rule 8.  See supra pp. 14-15.

allege the existence of any similarly-situated, non-Asian-Indian comparator who engaged in the same conduct as Shah but was not labeled "disruptive" or subjected to a hearing. Moreover, while Shah concludes that the hearing was biased and unfair, he does not allege that the procedures implemented during his hearing were any different than those used when other physicians attend such hearings.  Thus, Shah offers no facts from which one could reasonably infer that ICC subjected him to disciplinary standards different from those imposed on any other physician, or that the discipline was racially motivated.   In the absence of any factual allegations raising a reasonable inference that ICC subjected Shah to disparate treatment based on his race, the Court finds that the race discrimination claims against ICC are due to be dismissed as well.

### B. Retaliation

Under Title VII an employer is also prohibited from retaliating against an employee "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  "A prima facie case of retaliation under Title VII requires the plaintiff to show that: (1) [he] engaged in an activity protected under Title VII; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action."  See Crawford, 529 F.3d at 970.  "[I]n the context of a Title VII retaliation claim, a materially adverse action 'means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Crawford, 529 F.3d at 974 (quoting  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotations omitted)).  "[P]etty slights, minor annoyances, and simple lack of good

manners" in the workplace are normally not actionable under Title VII. <u>Burlington</u>, 548 U.S. at 68.   Additionally, the Supreme Court recently clarified that a Title VII plaintiff must demonstrate "but-for" causation to sustain a retaliation claim. <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, —— U.S. ——, 133 S.Ct. 2517, 2533 (2013).   "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." <u>Id.</u>

In the Response to OPMC Motion, Shah identifies the peer review hearing and the "constructive termination" as the adverse actions causally related to his complaints of race discrimination.  <u>See</u> Response to OPMC Motion at 17.   As to his retaliation claim against ICC, Shah contends that the causally related adverse employment actions are Gisel's statements at the hearing describing Shah as a "disruptive physician" and critiquing Shah's work and medical skills, and Shah's constructive termination.  <u>See</u> Operative Complaint ¶¶ 113, 136; Response to ICC Motion at 12-14.   The Court has already addressed Shah's claim of constructive termination, and thus simply reiterates that, for the reasons stated above, Shah has not adequately alleged any "severe or pervasive" harassment, be it of a racial or a retaliatory nature, sufficient to establish a constructive discharge.   With respect to the critiques of Shah and the MEC hearing, the Operative Complaint does not contain any facts indicating a causal relationship between those incidents and Shah's reports of race discrimination.   As explained above, Shah alleges that Alonso filed the "disruptive physician" complaint in response to Shah's decision to report an incident of patient mistreatment.  <u>See</u> Operative Complaint ¶ 54.   Moreover, while Alonso allegedly filed the complaint against Shah and facilitated the "biased" MEC hearing, Shah does not assert that he ever complained of racial discrimination to Alonso, or that Alonso otherwise had

reason to know of Shah's complaints.  See Glover v. Donahoe, 626 F. App'x 926, 931-32 (11th Cir. 2015) ("To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." (quoting Shannon v. BellSouth Telecomms., Inc., 292 F.3d 712, 716 (11th Cir. 2002))).  According to Shah, he reported the unequal treatment to Patrick and Coots.  See Operative Complaint ¶¶ 48-50.  As such, while it may be possible that Alonso retaliated against Shah for his race discrimination complaints, the retaliation claim is not plausible from the facts alleged, especially given the more reasonable inference that Alonso was motivated by Shah's reports of patient neglect.[12]

Moreover, Shah fails to allege facts indicating that the criticism he received or the MEC hearing itself negatively impacted him in any material way.  As discussed above, the Operative Complaint does not include facts suggesting that Shah suffered any real or threatened consequences as a result of these events.  Even under the broader retaliation standard, criticisms directed toward Shah's conduct at work and professional abilities, and the "sham" disciplinary hearing from which no discipline was imposed, absent any allegation of a material effect on Shah, cannot support a claim of retaliation.[13]  See Edwards v. Nat'l Vision Inc., 568 F. App'x 854, 862 (11th Cir. 2014) (finding no materially

---

[12] The Court also questions whether Shah sufficiently alleges any basis from which to infer a causal connection between his race discrimination claims and Gisel's comments.  Shah vaguely alleges that Gisel "ignored Dr. Shah's concerns," but the only individuals to whom Shah alleges that he reported the racial discrimination were Patrick, the Chief Executive Officer of OPMC, and Coots, the Chief Medical Officer of OPMC.  See Operative Complaint ¶¶ 48-50.  Although Shah frequently complained to Gisel about the mistreatment of patients, id. ¶¶ 32, 34, Shah does not directly allege that he informed Gisel of the perceived racial discrimination.  Thus, it is difficult to infer any causal connection between Shah's relevant protected conduct and Gisel's comments at the MEC hearing as well.  See Glover, 626 F. App'x at 931-32.

[13] Indeed, not only does Shah fail to allege that the hearing resulted in any adverse action against him, he affirmatively alleges that ICC and OPMC took "no action" following the hearing and two days later Shah resigned.  See Operative Complaint ¶ 67.

adverse action to support retaliation claim where employee was written up by her manager and placed on a performance improvement plan, but salary was unaffected); Rademakers, 350 F. App'x at 413 ("Neither the investigation itself nor the recommendation of termination were materially adverse actions, and [plaintiff] resigned voluntarily."); Morales v. Ga. Dep't of Human Res., 446 F. App'x 179, 183-84 (11th Cir. 2011) (finding plaintiff's evaluations and reprimands were not adverse actions to support retaliation claim absent any evidence of an effect on plaintiff's job status or salary); see also Hinton v. Va. Union Univ., ___ F. Supp. 3d ___, 2016 WL 2621967, at *17-19 (E.D. Va. May 5, 2016) ("[A]llegations of a reprimand, without alleging any other adverse consequences, does not properly plead the type of materially adverse action that would deter a reasonable worker engaging in protected activity and thus does not [satisfy] the adversity element of a Title VII retaliation claim."). Therefore, in the absence of any plausible allegations of an adverse employment action causally related to Shah's race discrimination complaints, Shah's retaliation claims against OPMC and ICC are also due to be dismissed.

In light of the foregoing, the Court will grant the OPMC Motion and ICC Motion with respect to the federal claims raised in this action. The Court observes that Shah is represented by counsel and has amended his complaint several times over the course of this lawsuit. Moreover, Shah has not requested leave to amend his complaint any further. Accordingly, the Court finds it appropriate to dismiss Shah's federal claims with prejudice. See Wagner v. Daewoo Heavy Indus. Am. Corp., 314 F.3d 541, 542 (11th Cir. 2002) (en banc) ("A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court.").

## IV.     Florida Whistleblower

Having determined that Shah's federal claims are due to be dismissed, the Court next considers whether to continue to exercise supplemental jurisdiction over the remaining state law claims.   Counts III and VI of the Operative Complaint contain claims for relief under Florida's Whistleblower Protection Act, section 448.102(3) of the Florida Statutes. See Operative Complaint at 16, 21.   "The decision to exercise supplemental jurisdiction over pend[e]nt state claims rests within the discretion of the district court." Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088-89 (11th Cir. 2004).   Pursuant to 28 U.S.C. § 1367(c), the Court may decline to exercise jurisdiction over a state claim if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  Notably, "[a]ny one of the section 1367(c) factors is sufficient to give the district court discretion to dismiss a case's supplemental state law claims." Parker v. Scrap Metal Processors, Inc., 468 F.3d 733, 743 (11th Cir. 2006).   However, upon determining that it has the discretion under § 1367(c) to decline jurisdiction, "[a district court] should consider the traditional rationales for pendent jurisdiction, including judicial economy and convenience in deciding whether or not to exercise that jurisdiction." Palmer v. Hosp. Auth. of Randolph Cnty., 22 F.3d 1559, 1569 (11th Cir. 1994).   Upon due consideration, the Court finds that judicial economy and convenience would not be served

by retaining jurisdiction over Shah's state law claims.  Thus, the Court declines to exercise its supplemental jurisdiction over these claims.

For the reasons set forth above, the Court has determined that each of the federal claims in Counts I, II, IV, V and VII-X of the Operative Complaint, over which the Court has original jurisdiction, are due to be dismissed.  What remains are uniquely state law claims that are best addressed by the state courts.  Although this case has been pending for an extended period of time, Shah has spent most of his time in federal court changing counsel, and amending his complaint.  See Docs. 33, 53, 68, 70, 75, 79.  The Court has not issued any dispositive rulings pertaining to the state law claims, and discovery has been stayed since September 14, 2015.  See Minute Entry (Doc. 66).  Thus, the early procedural posture of the case weighs in favor of declining jurisdiction to allow the case to proceed fully in state court.  Moreover, when, as here, the federal claims are dismissed prior to trial, the Eleventh Circuit Court of Appeals has "encouraged district courts to dismiss any remaining state claims."  Raney, 370 F.3d at 1089; Busse v. Lee Cnty., 317 F. App'x 968, 973-74 (11th Cir. 2009) ("Since the district court 'had dismissed all claims over which it has original jurisdiction,' it therefore had the discretion not to exercise supplemental jurisdiction over [Appellant's] state law claims.  28 U.S.C. § 1367(c)(3).  Furthermore, we expressly encourage district courts to take such action when all federal claims have been dismissed pretrial.").  See also Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine- judicial economy, convenience, fairness, and comity- will point toward declining to exercise jurisdiction over the remaining state-law claims.").

29

Upon consideration of the § 1367 factors and the "traditional rationales for pendent jurisdiction, including judicial economy and convenience," see Palmer, 22 F.3d at 1569, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.  Accordingly, Counts III and VI of the Operative Complaint are due to be dismissed without prejudice to refiling in the appropriate state court.[14]   In accordance with the foregoing, it is

**ORDERED**:

1. Defendant Orange Park Medical Center, Inc.'s Dispositive Motion to Dismiss Third Amended Complaint (Doc. 83) is **GRANTED**.

2. Defendants [sic] Intensive Care Consortium, Inc.'s Corrected Motion to Dismiss Plaintiff's Third Amended Complaint (Doc. 85) is **GRANTED**.

3. Counts I-II, IV-V, VII-X of Plaintiff's Third Amended Complaint and Jury Demand (Doc. 75) are **DISMISSED**.

4. Counts III and VI are **DISMISSED, without prejudice** to refiling in the appropriate state court.  As set forth in 28 U.S.C. § 1367(d), the period of limitations for this claim is tolled "for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

---

[14] The Court notes that Shah will suffer no harm from the Court's decision to decline supplemental jurisdiction because federal law provides for the tolling of the state limitations period while a state claim is pending in federal court.  Specifically, 28 U.S.C. § 1367(d) provides that:

> [t]he period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

As such, even if the statute of limitations has otherwise run on Shah's Florida Whistleblower claims, Shah has at least thirty days to refile his claims in state court.  See Dukes v. Georgia, 212 F. App'x 916, 917-18 (11th Cir. 2006); Dusek v. JPMorgan Chase & Co., 132 F. Supp. 3d 1330, 1354 n.18 (M.D. Fla. 2015).

5.  The Clerk of the Court is **directed** to terminate all pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, this 16th day of September, 2016.

MARCIA MORALES HOWARD
United States District Judge

lc11
Copies to:

Counsel of Record
Pro Se Parties